## AMALGAMATED ASS'N OF STREET AND ELECTRIC RY. EMPLOYÉS, DIVISION 441, v. DES MOINES CITY RY. CO.

(Circuit Court of Appeals, Eighth Circuit. September 20, 1926.)

No. 6938.

**1. Receivers ⚖➡88.**

Neither agreement with employés for arbitration of differences nor award thereunder is binding on receivers of street railway company, without advance authorization from court or subsequent approval.

**2. Receivers ⚖➡112.**

Court held not to have directed or authorized receivers of street railway company to accept contract with employés' association relating to arbitration of differences.

**3. Receivers ⚖➡115.**

Court, in receivership proceeding, held not to have adopted an arbitration award between receivers of street railway and employés' association, made pursuant to contract which it had not authorized receivers to accept.

Appeal from the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Receivership proceedings against the Des Moines City Railway Company, wherein the Amalgamated Association of Street and Electric Railway Employés, Division 441, as intervener, filed a claim, resisted by the Railway Company, which also pleaded a set-off. From a decree denying the claims of both parties, the Association alone appeals. Affirmed.

C. C. Putnam and Scott M. Ladd, both of Des Moines, Iowa, for appellant.

R. L. Read, of Des Moines, Iowa (J. G. Gamble and Sargent, Gamble & Read, all of Des Moines, Iowa, on the brief), for appellee.

Before SANBORN, STONE, and KENYON, Circuit Judges.

KENYON, Circuit Judge. This suit is one to recover wages alleged to be due members of the Amalgamated Association of Street and Electric Railway Employés, Division 441, appellant (hereafter designated the association), from Des Moines City Railway Company, appellee (hereafter designated the railway company).

In December, 1918, under a general creditors' bill, the United States District Court of the Southern District of Iowa appointed receivers, who took control of the property of the railway company, which consisted of the street railway system in Des Moines, Iowa. In 1922 a foreclosure bill was filed in the District Court of the United States against said railway company by the Harris Trust & Savings Bank of Chicago, Ill., as trustee, under the terms of a certain trust indenture covering said street car system; certain outstanding bonds and interest being due and unpaid. These two actions were consolidated.

The receivership terminated March 31, 1922, and the property was turned back to the railway company, which had in the fall of 1921 been granted a new franchise by the city of Des Moines. The decree restoring the property to the railway company provided for the assumption by the company of all liabilities and obligations incurred during the receivership, and it especially permitted the appellant association to file its claim in the consolidated proceeding; the court retaining jurisdiction to pass thereon. June 8, 1923, the association, as intervener, filed in said proceedings a claim for $56,744.73, with interest, which it alleged was due individual members of the association as unpaid back wages earned in the year beginning March 1, 1920. The railway company filed resistance to this claim, denying the same, and also stated matters of set-off amounting to $59,-727.59, arising from alleged overpayments of wages from March 1, 1921, to June 20, 1921. The court denied the claims of both parties. This appeal is by the association from the denial of the claim for back pay. There is no appeal as to the alleged set-off.

September 1, 1915, an agreement was entered into between the railway company and the association, to continue until March 1, 1940, determining the relationship of the company and its employés. It was in effect when the property was taken over by the receivers. Among the various provisions of said agreement was the following:

"Section 18. It is further agreed that if any question arises between the company and the association, or between the company and its employés who are members of the association, which cannot be adjusted by and between the officers of the company and the officers of the association, such question shall be submitted to a temporary board of arbitration for final adjustment. Such board shall be selected in the following manner: The company shall select one member and the association shall select one member within six days from the time the notice is given in writing by either party to the other that arbitration is desired, and upon failure of either party to name its arbitrator within the time specified the party so failing shall forfeit its case. The two so selected, in case they cannot reach a decision after a single conference or adjustment thereof, shall proceed as quickly as possible to select a third arbitrator. The board thus constituted shall proceed at once to hear the whole matter to be presented by each party concerned. At all hearings of the case by the board, both parties shall be represented; but failure of either party to appear at such hearing after reasonable notice shall not prevent the hearing of the case by the board, and the hearings of the board shall not be unreasonably delayed on account of the failure of either party to appear after proper notice. The decision of the majority of the board submitted in writing to the company and the association, shall be binding upon the parties hereto. Each party hereto shall pay the expense of his own arbitrator and the third arbitrator shall be paid jointly by the parties hereto."

A number of arbitrations with reference to wages took place while the property was in the hands of the receivers. The award under the fourth arbitration known as the Kirbye award is the basis of the claim in suit. It was made under an agreement of date April 1, 1920, of the receivers and the appellant association, which contained these provisions:

"Section 1. All parties to this agreement hereby agree that the differences regarding wages shall be jointly submitted to a board of arbitrators to be selected as provided in section 18 of the agreement entered into be-

tween the company and Local Division No. 441, dated September 1, 1915.

* * * * * * *

"Section 3. The decision of a majority of the board submitted to the company and the association shall be binding on the parties hereto, and shall be effective from March 1, 1920, to March 1, 1921, and thereafter unless changed as provided by the agreements between the company and the associations herein mentioned."

A majority of the board of arbitration signed the award providing compensation for motormen and conductors for the first three months' service at 64 cents per hour, for the next nine months 67 cents per hour, and thereafter 70 cents per hour, other employés accordingly. The claim of appellant association is based on this arbitration.

There was a fifth arbitration and award, which is the basis of the alleged set-off. This award was made June 18, 1921, and fixed the maximum wage scale for service of trainmen at 59 cents per hour, other employés accordingly, and provided that the reduction in wages was to take effect from the 20th day of June, 1921. The date on which the same was to take effect was not agreed to by one of the arbitrators.

It is the claim of appellant that the court expressly approved the contract between the railway company and the association, and that the receivers were directed to administer the property in accordance with the terms thereof, and further that the court adopted the so-called Kirbye award, and proceeded thereunder.

[1] Appellee's claim is that the District Court never adopted the contract of either September, 1915, under which the Kirbye award was made, or the Kirbye award, and did not order the receivers to pay wages at the rate of 70 cents an hour commencing March 1, 1920. In the reply it is suggested that the question of the adoption by the court of the contract referred to is not very material, for the reason that the wages in any event were fixed by arbitration, and the award was made in pursuance of an agreement between the receivers and the association. There is no dispute in this case as to the award, or as to the amounts. There is no question of law involved. The questions are of fact. Of course, the agreement for arbitration, or the award thereunder, would not bind the receivers without either authorization from the court in advance or approval thereafter. Appellant states the whole case in its brief thus: "If this award was binding on the receivers, then recovery should be had by the association on its claim. If not so binding, then the claim should be dismissed."

[2] The first question of fact is: Did the court direct or authorize the receivers to accept the contract between the association and the railway company? We refer to the order of the court and the proceedings with relation thereto. The receivers filed an application with the court, asking instructions as to said contract, and the court on June 24, 1919, entered an order in which it stated:

"The court is of opinion that the financial result of the operation of the property of the said defendant by the receivers of this court is such as to render it impracticable and undesirable for the court to direct the said receivers either to accept or reject the said contract between the Des Moines City Railway Company and the said Amalgamated Association of Street Railway Employés Local Division No. 441, until a further opportunity to determine the effect of the said contract upon said operations of the said receivers is had.

"It is accordingly considered ordered and adjudged by the court that the said receivers be and they hereby are authorized and directed to adopt the said contract in existence between the Des Moines City Railway Company and the Amalgamated Association of Street Railway Employés, Local Division No. 441, for the period of six months from the date of this order, upon the condition and with the understanding that this court will and does hereby reserve full power to further direct its said receivers in connection with the said contract, and the further operation thereunder at the expiration of said six months period, or any time thereafter, and subject to the above and foregoing condition the said receivers shall proceed with the administration of the property in accordance with the terms of said contract.

"It is further ordered that the said receivers may, at the expiration of said period of six months from the date of this order, bring the matter to the further attention of the court for such orders as may be deemed desirable under the circumstances then existing.

"It is further ordered that all proceedings and relations between the said parties, pursuant to the terms of the said contract, during the said six months' period, shall be subject to the aforesaid reservation of power in this court to review or reconsider the entire matter at the time indicated."

December 24, 1919, the court entered a further order as follows:

"Now, on this 24th day of December,

1919, the above-entitled cause comes on for hearing upon the application of the receivers for an order respecting the continuance in force and effect of that certain contract entered into by and between the Amalgamated Association of Street Railway Employés, Division No. 441, and the defendant; the said receivers appearing by their counsel, Sargent & Gamble, and the said Amalgamated Association of Street Railway Employés, Division No. 441, appearing by C. C. Putnam, attorney. The court, having considered the said application and being fully advised in the premises, is of opinion that the said contract should be continued in force and effect to and until March 1, 1920, and that the said receivers should pay to the employés covered by the said contract the rates, or schedule of wages, specified by the arbitration award of November 14, 1919, to and until March 1, 1920.

"It is accordingly considered, ordered, and adjudged that the said contract entered into by and between the defendant in this cause, and the Amalgamated Association of Street Railway Employés, Division No. 441, be adopted by the receivers and continued in force and effect to and until March 1, 1920.

"It is further ordered that the said receivers shall pay to the employés covered by the said contract the rates or schedule of wages, specified in the award of the arbitrators dated November 14, 1919, to and until March 1, 1920."

These orders are the only ones directly bearing upon the contract of 1915, and it is clear they do not constitute an adoption of the contract for any period beyond March 1, 1920. After that date the subject was an open one. The parties, apparently without any question being raised, did act under the terms of the contract in the so-called Ladd award of June 19, 1921; the notice for such arbitration initiated by the receivers stating a desire to submit the matter in question to arbitration in accordance with the terms of the contract of September 1, 1915. There was no specific adoption, however, of the contract covering the period from March 1, 1920, to March 1, 1921, the year to which the Kirbye award applied.

The claim that the Kirbye arbitration and award were authorized in advance through the adoption of the 1915 contract by the court is in no wise sustained by the record, but is expressly negatived.

[3] The second question of fact is: Was there an adoption of the Kirbye award by the court? This requires a consideration of a large number of orders entered in the case.

The agreement for arbitration resulting in this award was signed April 1, 1920. The award was rendered some time later, and was retroactive in effect, and purported to fix the scale of wages from March 1, 1920, to March 1, 1921, and thereafter unless changed. For employés who had been in service more than a year the maximum wage per hour was increased to 70 cents. This award states:

"The books of the company show a deficit of $116,123.50. Approximately this new award in wage will add $250,000 to this amount. It will be necessary for the company, therefore, to secure additional income, or to cut service correspondingly, or to put the cars in the barn. * * * If no relief is provided for the company in the way of additional income, then, of course, there is nothing to do but to cut the service or to place the cars in the barns."

After the award, the receivers filed on May 5, 1920, a report in which it was pointed out that the railway company could not be operated so as to earn enough to pay the wages fixed by the Kirbye award; that not exceeding 60 cents per hour could be paid, and they asked that the contract of 1915 be regarded and adjudged as void, and that the receivers be authorized to continue the employment of the men at 60 cents per hour. On May 6, 1920, the court ordered the city of Des Moines and the employés to answer the application of the receivers by May 8, 1920. The employés duly filed answer, asking that the application be denied, so far as it prayed for nullification of the contract and agreement and arbitration award. A hearing was had, and the court, on May 20, 1920, made an order in which it found:

"That it is impossible for the receivers to pay upon the basis of said award the 70 cents per hour maximum rate; but in view of the present earnings and the prospects, it is ordered that until further orders herein the receivers shall pay wages upon a basis of 60 cents per hour maximum, together with relative wages to other employés, the same to commence March 1, 1920. * * * The application of the receivers, together with the answer of the city and the employé, shall be continued and may be brought on for hearing for further order by any of the parties upon reasonable notice. All parties except."

The receivers proceeded in accordance with these orders and paid to the employés wages at the maximum rate of 60 cents per hour. Prior to August 12, 1920, a petition had been filed by one F. Mathis, a citizen of Des Moines, and the employés, asking the

court to interpret section 17 of the franchise to be void, and that an order be entered directing the receivers to pay the employés the maximum of 70 cents per hour as soon as the revenues from such fare as ordered were adequate to enable such payment.

August 13, 1920, upon hearing, the court declared the fare provided in section 17 of the franchise void, and ordered the receivers, the city, and the employés to reach a temporary agreement and report to the court on or before August 20, 1920. No agreement was arrived at. Matters were evidently not satisfactory to the employés. The record shows the situation was becoming acute. A strike was ordered in August, 1920, by the association's officers. August 19, 1920, the receivers reported to the court that they had done all they could in the way of meeting service and the demands of the men.

August 21, 1920, Judge Wade entered an order increasing the rates of fare upon the street railways of Des Moines to 6 cents, it having theretofore been five. The difficulties of the situation are portrayed in said order. We quote therefrom:

"Of course, no one connected with the proceedings claims that service can be continued at a 5-cent fare. I will not, however, undertake to determine what fare should be paid as a permanent matter. I shall only undertake to act in this emergency, so that for a short period of time the people of Des Moines have street car service. * * * The additional income from this increased fare shall, for the present, and until further ordered, be applied upon the current wages of the men up to the amount fixed by the last arbitration which has been reported to this court."

The city of Des Moines insisted the fare should remain at 5 cents and threatened to enjoin the 6-cent fare. The employés continued to assert their determination to strike. August 23, 1920, the receivers filed application asking for instructions, and stating:

"That in the order entered in the above-entitled cause on August 21, 1920, it is among other things, provided: 'The additional income from this increased fare shall, for the present and until further ordered, be applied upon the current wages of the men up to the amount fixed by the last arbitration which has been reported to this court.' That there is a contention made by the employés, of these receivers that this provision of your order means that back wages since March 1, 1920, shall be paid, as well as current wages for future work, on the basis of 70 cents per hour as a maximum for car men as specified

in the last arbitration award; that it is also contended by the employés that such pay for back wages should be made immediately out of any funds on hand."

August 23, 1920, the court by wire gave the following direction to the clerk of the court:

"Enter order that extra cent in street car fare shall all be applied to the increased wage award. Any balance over amount required to pay current wages to be applied upon back wages; that, if there is a strike, street car service will be suspended indefinitely. No strike breakers will be imported. Des Moines will have peace, even if the street car men make the rest of the laboring men and women walk to work."

August 25, 1920, Judge Wade, having received notification that a strike was imminent, entered another order in which he says:

"I am sorry to say that there is nothing further that I can do in regard to the street railway strike. I have gone the limit. I worked out a plan which provided for the payment to the men of the 70 cents per hour provided for in the last arbitration, and also providing for the payment of all back pay. Under the order for the 6-cent fare I figured that within three or four months all back pay would be paid in full. The men would not have to wait for three or four months for back pay. They would start receiving it at once at the rate of about $15,000 per month, and probably double that the first month on account of the increased income due to the State Fair. * * * In making the order I suggested that, in case of strike, I would order canceled the contract with the men in so far as the receivers were concerned. I find that this is not necessary. There is now no contract with the men. The men are not working for the receivers. They have voluntarily quit the employment of the receivers, and consequently have given up any rights which they had under the contract. I hope that they may be re-employed by the receivers; most of them are good men, but, if re-employed, it will be upon terms and conditions agreed upon and approved by this court. I will approve any reasonable terms."

In this order all service of the street railway company was suspended. The order further said:

"The public will understand that the receivers have no power to make any contracts or agreements with relation to fares or wages or employment of men without further orders of this court. This court will entertain any application on the part of the city for an order directing the receivers with reference

AMALGAMATED ASS'N, S. & E. RY. EMPLOYÉS v. DES MOINES CITY RY. CO.      841.

14 F.(2d) 836

to their duties in any matters pertaining to fares or service at any time."

Immediately· after this order was made, negotiations were commenced looking to a termination of the strike and a restoration of street car service. The receivers reported to the court on the very day the order was entered, in part as follows:

"That the executive committee of Local Division No. 441, Amalgamated Association Street Railway Employés, have approached your receivers with the proposal that your receivers' former employés will resume service in the employ of your receivers upon and in accordance with the conditions outlined in your honor's order entered in this cause on Monday, August 23, 1920; that is to say, that the excess revenue derived from the extra one cent authorized by your honor to be charged for street railway fares shall be devoted, first, to the payment of the current wages of the employés of your receivers on the basis of the last arbitration award reported to this court. By current wages is meant from and after the resumption of service by the men. That thereafter any additional excess in such extra revenue received from such extra one cent fare shall be. applied upon wages accruing under the terms of the last arbitration award since March 1, 1920, which have not been paid under the orders of this court. It being expressly understood that the status of such employés and their employment shall be in identically the same situation as existed immediately upon the entering of your honor's order of August 23, 1920."

The same day the court entered an order providing that, if all employés would resume service, the receivers should accept them under the order of August 23, 1920, and all other previous orders theretofore entered in the case; the employés to be reinstated in exactly the. same position as they held before the strike with reference to wages and legal rights. The men went back to work and peace prevailed. September 17, 1920, the receivers asked instructions of the court in respect to the application of the additional income derived from the one-cent increase of fare. Judge Wade entered an order September 17, 1920, directing the receivers to pay the men the entire income derived from the one cent additional fare, said amount to be applied on their wages in excess of 60 cents per hour.

October 13, 1920, the receivers again applied for instructions, and in their application showed the result of the operation for the month of September, under a 6-cent fare

and a wage of 70 cents per hour without any back pay for employés, was a deficit of $5,‑532.95, and further showed that, had they paid on the back pay all the one cent extra fare per passenger collected, the deficit would have been $17,943.30. The court on October 18, 1920, found that the one-cent increase in fare had reduced travel, and that the court's intention had been that the net results from the one-cent increase should be applied on back wages after current wages were paid. A part of that order is as follows:

"Now, on this 18th day of October, 1920, in the above-entitled cause, it is ordered that the receivers shall pay to the employés upon the current wages and upon back wages the proceeds from the extra one cent provided for in the order heretofore made. But it is also ordered that hereafter there shall be applied on back wages only the net amount derived therefrom after paying the current advanced wages and providing for fixed charges; in other words, the amount to be applied on back pay will be the net amount which is derived from the advanced fare ordered to be collected by the receivers, unless in the meantime some other plan is devised and some other order made. The order for a 6-cent fare shall continue, and this order shall continue until modified or revoked by order of court."

November 5, 1920, the court appointed three special masters to consider the condition of the railway company, with a view of reporting to the court some plan enabling it to operate and furnish service. November 30, 1920, a report was filed by the special masters, finding that the retroactive wages unpaid amounted to $56,844.73, and these masters recommended the establishment of an 8-cent fare. The city filed exceptions to the recommendations of the masters as to the 8-cent fare. December 4, 1920, the receivers filed a report of a conference with the masters.

December 11, 1920, the court filed a memorandum and order reviewing the entire situation, in which the condition of the company was considered, and in which the court demonstrated that the 5-cent fare was utterly insufficient to carry on the business of the company and pay debts and operating expenses, and entered an order providing for an 8-cent fare, except as to school children. The order stated:

"The truth is that Des Moines had a 5-cent fare from 1916 until last August, when the new wage scale compelled the receivers to pay out several hundred thousand dollars in a year in increased wages. The only solution was to reduce the service. The city in its

franchise ordinance fixed a 5-cent fare, which was regarded as binding until the Supreme Court of Iowa held otherwise. When the franchise was granted, the wages of men was about 30 cents an hour; now it is 70 cents per hour. There has been added to the cost of operation, since the 5-cent fare was agreed upon as fair and just, for labor alone on the present reduced service, $562,689.94. In other words, the receivers now pay out on the present schedule $562,689.94 more for labor each year than was paid out the first year of the franchise. * * * The back wages of the men, earned last spring, is $56,844.73. Preferred claims have been allowed in the sum of $97,525. There is still $10,000 of receivers' certificates outstanding for wages of men. There is no money in the hands of the receivers to pay these honest obligations, and no source of getting money except by the fares paid by the people. * * * The extra one cent allowed in the 6-cent fare was to pay the increased wages of the men. The representatives of the city of Des Moines have approved and insisted upon the payment of every increase of wages of the men. I thought the 6-cent fare might bring in enough money to pay the current increase, and gradually pay the back pay of the men, but experience has shown that it will not do so."

The order also contained this provision: "Orders will be hereafter made with reference to the application of some of this increase to the back wages of the men and to the payment of preferred claims."

This résumé, made difficult by lack of any chronological arrangement of the court's orders in the record, covers substantially all matters appearing as to the action of the court relative to the Kirbye award. At no time did the court unconditionally approve the same. In fact it disapproved it at the very first presentation thereof, holding it was impossible for the receivers to pay upon the basis of said award the 70 cents per hour maximum rate, and ordered them to pay on the basis of 60 cents per hour maximum. It is true that in some of the orders the court referred to the contract as if it were in existence—referred to back pay and to the payment to the men of the 70 cents per hour provided in the Kirbye arbitration. Of course, the so-called back pay arose only out of the Kirbye award. However, if the court was accepting and adopting the Kirbye award, it would not have established the 60 cents per hour maximum pay. Evidently the court was trying to evolve a plan whereby, out of the increased earnings by the rais-

ing of the fares, the men would receive the so-called back pay representing the 70 cent per hour maximum as provided in the Kirbye award. The qualification and condition as to any approval of this award was the raising of the amount without impairing the corpus of the property. The court was proceeding under great difficulties in a most troublesome and serious situation. Its attempts were in the nature of an experiment. A statement made here and there may be cited from which a somewhat plausible argument can be adduced that the court adopted the Kirbye award; but, taking the case in its entirety and considering the orders made in the light of the situation presented, it is perfectly apparent that the court did not adopt the award unconditionally. The Kirbye arbitration itself seems to be contingent on additional income, for the arbitrators state that, if no relief is afforded the company in the way of additional income, there is nothing to do but to cut the service or place the cars in the barns, implying at least that the amounts provided in the award could not be paid without additional income.

Judge Wade, in his final opinion and order of July 30, 1924, from which this appeal is taken, said:

"(b) Searching the entire record, no one will contend that the court has expressly approved the wage contract between the railway company and the men, and in so far as adopting the same by a course of conduct which would estop, as far as the court is concerned, the record discloses a continuous controversy over the question. Receivers at different times asked the court to reject the contract and also the award in controversy, and the men in resistance always insisted on enforcement of the contract; but at no time did the court do more than to refuse the application of both parties and authorize experiment periods to determine whether the contract and award could be approved.

"Upon any of these orders denying the demand that the contracts and awards should be approved, or granting only a period of experiment, the men had the right to appeal from this court to the Circuit Court of Appeals and have their rights determined by three disinterested capable judges. But no appeal was taken, and, on the contrary, the men accepted the rulings of the court and continued thereunder. Notably is this true when the court ordered the receiver to pay the men, not 70 cents per hour as in the award, but 60 cents per hour. Thereafter, in an attempt to do justice by the men, I or-

dered a 6-cent fare, one cent of each fare to be applied upon what was termed 'back pay,' hoping that this plan would eventually enable the court to approve the payment of 70 cents per hour, but leaving the question open as to whether the award could be approved."

Judge Wade should know better than any one else what the court intended to do as to the adoption of the contract or of the Kirbye award. His own construction of his acts, as set forth in the memorandum of July 30, 1924, agrees with our conclusion from a careful study of this record. He was endeavoring to give the employés increased wages by increasing passenger fares.

There is no need of discussion as to the set-off claimed by the railway company for alleged overpayments to employés between March 1, 1921, and June 20, 1921; no appeal being taken from the action of the court thereon.

It is our conclusion that none of the grounds upon which appellant bases its claim to relief has been established.

The *order of the District Court, denying the claim of appellant, is affirmed.*